## ICHABOD MACOMBER *et al. versus* LEVI PARKER.

By a contract between H & L, lessees of a brick-yard, and E, it was agreed that E should make bricks in the yard, and pay H & L at a certain rate for the clay, and that H & L should purchase wood, sell the bricks, &c.; that the profit or loss should be divided between them; and that H & L should have power to retain the bricks in their possession to the amount of all sums of money which they might from time to time advance to E. Afterwards E drew an order on H & L to pay one D what sums might be due to E from the sales of the bricks after deducting the amount due to H & L for their advances. Afterwards H & L assigned all their property to the plaintiffs, including their interest under the contract above mentioned, and the plaintiffs went into the brick-yard and gave E notice of the assignment, and he assented to it, and agreed to act as agent of the plaintiffs; who on their part agreed to make advances in the same way that H & L were to do under the original contract. The plaintiffs took possession of the brick-yard and of property therein, and by writing gave the charge of it to E, with directions to sell the bricks at retail for cash, and whenever a certain sum should be received, to deposit it in a bank to the plaintiffs' credit. The bricks were subsequently attached at the suit of a creditor of E. In an action of replevin by the plaintiffs against the attaching officer it was *held*, that the right of H & L to retain the bricks as security for their advances to E, was assignable, with the consent of E, and that the plaintiffs had a lien which must prevail against the attachment. It was also *held*, that the order drawn by E was admissible in evidence, as tending to establish the original contract on the part of E, that H & L should retain E's part of the bricks as collateral security.

Although there cannot be a pledge, technically speaking, of a chattel not in existence, there may be an hypothecation, so that as soon as the chattel shall be produced the lien will attach. Thus where it was stipulated by a brick-maker, that the lessees of a brick-yard should retain the bricks to be made, as security for their advances to the brick-maker, it was *held*, that the bricks became pledged as fast as they were manufactured.

Possession of a chattel by the vender or pledger is only evidence of fraud; which may be rebutted by proof that he held possession as the agent or servant of the vendee or pledgee.

REPLEVIN for three kilns of bricks attached by the defend ant on several writs against Joseph Evans. Plea, property in Evans. Replication, property in the plaintiffs. Trial before *Putnam* J.

Hunting & Lawrence were lessees of a brick-yard in Cambridge. On March 1, 1829, they made a contract in writing with Joseph Evans, by which Evans agrees " to make from eight to ten hundred thousand good merchantable brick on the brick-yard, to hire the men and board to the best advantage, and to give in his time and services in making the bricks ; and Hunting & Lawrence agree to attend to selling of brick, purchasing of wood and all necessary materials for the manufactur

42 *

Macomber
v.
Parker.

ing, collecting the bills, &c., to the best advantage ; and after the brick are made and the labor and board of the men are paid, and all materials and tools of every kind are paid for, and Evans paying Hunting & Lawrence sixty cents per thousand for each and every thousand brick made or clay sold as rent therefor, the parties agree to share the profit or loss, one half each. Hunting & Lawrence shall have full power to retain Evans's part of the brick or money collected or debts due for brick, &c., in their possession, to the amount of all sums of money now due from Evans, and such other sums of money, goods, &c., as they may from time to time advance him."

The plaintiffs called Hunting as a witness ; who testified, that on June 10, 1829, Evans drew an order on Hunting & Lawrence, which they accepted, to " pay over to Thomas Drew, and indorse the same on my note given to James Langley now in the possession of Drew, what sum of money may be due me from the sales of brick made in 1828, after deducting all sums of money due to Hunting & Lawrence for their advances &c. ; also what may be due me for making brick this season, after all the men and help are paid and all other sums of money due or may be due to Hunting & Lawrence for their advances to me." Hunting also proved the assignment on July 3, 1829, from Hunting & Lawrence, of all their property, including their interest in the brick-yard and their rights under the contract with Evans, to the plaintiffs, and that on the same day the plaintiffs went to the brick-yard and gave Evans notice of the assignment, and that he assented to it, and agreed to act as agent for the assignees. Evans inquired of the assignees, how he was to be supplied with funds ; and they answered, " by the assignees, in the same manner as Hunting & Lawrence were by the contract to have supplied him." The witness carried a written authority from the assignees to Evans, dated July 3, 1829, directing him " to take the charge and care of all the property and effects in and about the brick-yard, and to proceed to sell the same at retail until further orders from us, for cash only, and whenever the sum of 100 dollars is received, to deposit the same in the Branch bank to our credit." Possession was given of all the property in the yard to the assignees. They became dissatisfied with Evans, and appointed the wit

ness as their agent. They were desirous of settling with Evans, and the witness, in their behalf, on February 24, 1830, went with Evans into the yard and estimated all the bricks, &c., according to a paper produced at the trial. On February 26th, the witness, on behalf of the assignees, agreed with Evans, that the assignees should take all the bricks at the price set down in the paper above mentioned, for $2030, and should give Evans credit for that sum, and if, upon an exact counting, the bricks should overrun, they were to allow and credit the surplus; if they fell short, Evans was to allow for the deficiency, at the rate agreed upon. One half of the amount of the whole, including boards, tools, &c., was to be credited to Evans; and Evans was to cart the bricks to Boston, for the assignees, for one dollar a thousand. Evans, after this agreement, carted one load of bricks to Bates & Frost, on the Saturday next before the Monday when the defendant attached the bricks as the property of Evans. There was a balance due from Evans to the assignees after giving him credit for his part of the property, but the exact amount was not proved. The assignees advanced about $1000 to enable Evans to carry on the work under the contract. After the agreement on February 26, 1830, Evans was not to have any thing more to do with the yard, but only to cart the bricks; and no more bricks were to be made under the contract. The witness said he intended to effect a sale of all Evans's part of the bricks to the assignees, and completed it on the 26th.

It was testified by Frost, that Evans, while acting as the agent for the assignees, said that he was authorized to sell for cash only, and not upon credit.

These facts were relied on by the plaintiffs, as proving that they held the possession of all the bricks; of Evans's part, as security in virtue of the contract before mentioned, as well as of the part assigned to them by Hunting & Lawrence.

The testimony of Hunting was contradicted by Evans. He denied the sale, and said there was only an intent to take the account of stock, &c.

The jury were instructed, that it was material to settle as a fact, whether the plaintiffs retained the possession of Evans's part of the bricks, for their security under the contract; that

if they intended to do so, and the evidence in the case was satisfactory that they did so hold and retain it under the contract of March 1, 1829, the creditors of Evans had no right to take the property out of their possession, and they had such a property and possession as would enable them to maintain this action ; that if the plaintiffs had not retained the possession of Evans's part of the bricks, as above mentioned, it was liable to the attachment made by the defendant for the creditors of Evans, and the verdict should be for the defendant : unless the jury were satisfied that Hunting had stated the truth in regard to the sale on the 26th of February ; in which case they should find for the plaintiffs.

The jury were further instructed, that the power to retain possession of Evans's half of the bricks, &c., as security for advances, &c., secured to Hunting & Lawrence by the contract of March 1, 1829, was assignable with the consent of Evans, and that there was evidence of facts and circumstances in the case, from which the jury might infer such assignment and assent, and that the plaintiffs represented Hunting & Lawrence and had their rights.

The jury found a verdict for the plaintiffs, with nominal damages.

Under the instructions, the jury might have found a verdict for the plaintiffs if they believed that the plaintiffs had in fact kept and retained the possession of Evans's part of the bricks under the contract of March 1, 1829 ; and if the instructions were wrong, or if the evidence was not sufficient to maintain the verdict upon that ground, a new trial was to be granted.

It was not contended by the defendant, that the transactions above stated were fraudulent as against creditors.

The defendant moved for a new trial,

1. Because the judge permitted the order drawn by Evans upon Hunting & Lawrence in favor of Drew, to go to the jury as evidence, notwithstanding the defendant objected thereto.

2. Because the judge instructed the jury, that whether the plaintiffs were entitled to the property in question by virtue of a lien thereon for advances made under the contract of March 1, 1829, was a question of intent only, to be gathered from the facts in the case ; and because the judge put it to the jury to

say whether, from the facts, the plaintiffs intended to keep possession of Evans's half of the property as security for advances, and if they found that the plaintiffs did so intend, their verdict must be for the plaintiffs, and Evans's creditors could not step in and defeat the intention by their attachment.

3. Because the jury were instructed, that the power to retain possession of Evans's half of the property as security for advances, &c., secured to Hunting & Lawrence by the contract of March 1, 1829, was assignable with the consent of Evans, and that there was evidence in the case from which the jury might infer such assignment and assent, and that the plaintiffs represented Hunting & Lawrence and had their rights.

*Buttrick* and *R. S. Fay* in support of the motion. The order in favor of Drew was inadmissible in evidence. It was drawn upon a contingent fund, which never came into the hands of Hunting & Lawrence, so that they were not liable on their acceptance, and when they made their assignment, the plaintiffs did not become bound by the acceptance. The order had no tendency to prove that Hunting & Lawrence had taken possession of the bricks to acquire a lien, or that the bricks were in existence, and it had no bearing on the case. *Ex parte Heywood,* 2 Rose, 355 ; *Hassall* v. *Smithers,* 12 Ves. 119 ; *De Wolf* v. *Chapin,* 4 Pick. 59 ; *Charlton* v. *Lathe,* 7 Pick. 44.

The plaintiffs had no lien on the bricks by virtue of the con tract of March 1, 1829, and the assignment from Hunting & Lawrence. Hunting & Lawrence were partners with Evans, and during the continuance of the copartnership there could be no such lien as between Hunting & Lawrence and Evans ; and if Hunting & Lawrence had no lien, their assignees can have none. But if the plaintiffs and Evans became tenants in common, a lien could not subsist as between them without possession. *Sweet* v. *Pym,* 1 East, 4 ; *Homes* v. *Crane,* 2 Pick. 607 ; *Lickbarrow* v. *Mason,* 6 East, 27. The plaintiffs went upon the brick-yard, merely to take possession of Hunting & Lawrence's share of the property, and not to obtain a lien. It may be urged that the possession was in the plaintiffs, inasmuch as Hunting & Lawrence were lessees of the yard ; but Evans was sub-lessee, paying a rent of sixty cents per thousand bricks, and was in possession

Macomber
v.
Parker.

*Burt* v. *Moore*, 5 T. R. 329 ; Co. Lit. 4 , *Rex* v. *Tolpud-dle*, 4 T. R. 671 ; *Wilson* v. *Mackreth*, 3 Burr. 1826 ; *Crosby* v. *Wadsworth*, 6 East, 602 ; Shep. Touch. 267 ; Bac. Abr. *Lease, K ; Butterfield* v. *Baker*, 5 Pick. 522 ; *Wait, Appellant*, 7 Pick. 100. He had unlimited control of the bricks and was selling them and receiving the proceeds, at the time when the attachment was made. It is said he was in possession as agent, but he could not be in possession as agent, to preserve the lien, any more than a debtor whose property is attached, can be in possession to preserve the attachment. *Train* v. *Wellington*, 12 Mass. R. 497 ; *Bridge* v. *Wyman*, 14 Mass. R. 195 ; *Carrington* v. *Smith*, 8 Pick. 419 ; *Ex parte Coming*, 9 Ves. 115 ; *Wilson* v. *Balfour*, 2 Campb. 579 ; *Ex parte Whitbread*, 1 Rose, 299. Besides, the bricks were not made at the time, and a lien cannot attach until the property is in existence.

But if the plaintiffs took possession with a view to a lien, they have waived the lien, as they claim to hold by a better right, namely, by a sale. Woolrych's Commerc. Law, 231 ; *Boardman* v. *Sill*, 1 Campb. 410, note.

The instruction that the right to retain possession, secured to Hunting & Lawrence, was assignable, was incorrect, a lien being a personal privilege. *Daubigny* v. *Duval*, 5 T. R. 606 ; *Holly* v. *Huggeford*, 8 Pick. 73 ; *Bonsey* v. *Amee*, ibid. 236.

*D. A. Simmons* and *Gay*, for the plaintiffs.

*April term
1834.*

Putnam J. delivered the opinion of the Court. It has been settled at the former hearing of the law in this case,* that Evans had a joint interest in the bricks, with Hunting & Lawrence, under the contract of March 1, 1829.

Hunting & Lawrence had funds and were to make advances to Evans for the wood and all materials, and were to be allowed therefor on settlement, together with sixty cents per thousand for the clay ; the brick-yard was in their possession as lessees , Evans was to give in his time and services, in the making the bricks ; and the profit and loss were to be divided between them, after the account should be settled upon these principles.

It was expressly agreed between them, that Hunting &

---

* See *Macomber et al.* v. *Parker*, 13 Pick. 175.

Lawrence should *retain* the said Evans's part of the bricks, or money collected or debts due for bricks, in their possession, to the amount of all sums of money, goods, &c., as they might *from time to time advance to him.*

It appears that on the 10th of June 1829, Evans drew his order on Hunting & Lawrence to pay Thomas Drew " what sum of money might be due to Evans from the sales of the bricks in 1828, after deducting all sums of money due to them for their advances, &c. *Also,* what might be due for the making of the bricks this season, after all the men and help are paid and all other sums of money due or which may be due to Hunting & Lawrence for their advances to me." The money which might be so received by Drew was to be endorsed on Evans's note then held by Drew.

So this order was for value received. And Hunting & Lawrence, on June 10, 1829, accepted it in writing, to pay what might be due as above stated.

The legal operation of this order was to assign and transfer to Drew, what should remain due to Evans upon a final settle-ment of this concern.

It has been objected that this order ought not to have been admitted, but we all think it was competent evidence, tending to establish the original contract on the part of Evans, as it recognises the right of Hunting & Lawrence to *retain* Evans's part of the bricks as collateral security ; which is one of the great points in the cause.

Evans went on with the work, until Hunting & Lawrence failed, and on July 3, 1829, assigned their interest to the plaintiffs. In virtue of that assignment the plaintiffs (as they contend) stood in all respects in the same right and condition that Hunting & Lawrence did. On the same day, the plaintiffs went into the brick-yard and gave notice to Evans of the assignment which Hunting & Lawrence had made to them. *Evans assented to it and agreed to act as the agent of the plaintiffs ;* and they, on their part, agreed to make advances, in the same way and manner as Hunting & Lawrence were to do under the original contract.

It is contended by the counsel for the defendant, that the lien which Hunting & Lawrence had (if they had any at all)

was a personal privilege, and could not be transferred or assigned. But it is very clear that the parties to the original contract might modify or alter it at their pleasure. And we can perceive no reason why, with the consent of Evans, the plaintiffs might not become the assignees of Hunting & Law rence of their right to retain, as well as of all other rights which had accrued or might arise under the contract. It was a substitution of the plaintiffs in the place of Hunting & Law rence, with Evans's consent. And the defendant who claims under Evans, cannot make any valid objection to it. *Urquhart* v. *M'Iver*, 4 Johns. R. 103.

It was proved that the plaintiffs took possession of all the property in the yard, and by writing, on the same day, they gave the charge of all the property in and about the yard to Evans, with special directions to sell the same at *retail for cash and when a sum amounting to* 100 *dollars was received, he was to deposit it in the Branch bank to the plaintiffs' credit.* I was proved that Evans then proceeded with the work, he and the plaintiffs being tenants in common. The plaintiffs were to retain the possession of the bricks, &c., just as Hunting & Lawrence were to do; and the profits and losses were to be divided according to the terms of the original contract.

It is not easy to perceive, (fraud being out of the question,) that there is any thing unjust, illegal or inexpedient in this arrangement.

It was not suggested at the trial, that there was any moral fraud, or any intent to do wrong. But the transaction is called in question by a creditor of Evans, who has interfered and attached the property as belonging to Evans, in common with the plaintiffs, on the ground that the law will not uphold this transaction ; and the question is, whether their attachment should prevail, or whether the plaintiffs should hold the property until their advances should be paid.

It appeared at the trial, that after the settlement of the concern, there would not be enough in the hands of the plaintiffs to pay what was due to them from Evans ; so that nothing could become due to Drew, who stood in the place of Evans, in regard to any balance remaining after the plaintiffs had deducted the advancements &c.

Let us consider the nature of the original contract or agreement, and whether it is such as the law will sustain.

As before observed, it was a *bonâ fide* transaction, which the law delights to uphold, if it can, without violating any settled rules it has prescribed.

*It was an agreement for the pledging of the bricks as they should be made.* It is true that where the property is to be thereafter acquired, it is not strictly and technically a pledge ; it is rather an hypothecation ; but when the title is acquired *in futuro*, the right of the pledgee attaches immediately upon it. Story's Bailments, *p.* 200, § 294 ; Domat, Civ. Law, *bk.* 3, *tit.* 1, § 1, *no.* 5 ; Ayliff, Civ. Law, *bk.* 4, *tit.* 18, *page* 530. " Not only goods in present possession, but even goods in reversion, are comprehended under a general pawn or hypotheque, as corn in the ground, a ship to be built with the timber pledged, if there be a clause inserted to comprehend it." " An hypotheque may be an assurance of a thing to be delivered hereafter," ibid. *page* 525, 542.

. In Montag. on Liens, 36, note (*c*), it is said, that " it is usual to speak of *lien by contract*, though that is more in the nature of *an agreement for a pledge*. Taken either way, however, the question always is, whether there be a right to detain the goods till a given demand shall be satisfied ;" citing *Gladstone* v. *Birley*, 2 Meriv. 404.

This citation presents the point under consideration with great precision. Have the plaintiffs a right under the original contract, assignment and subsequent proceedings, to retain the bricks until their claims arising from the making of them, &c., shall be paid ? Or shall the attaching creditors avail themselves of the plaintiffs' funds to pay Evans's debts ?

It is contended that Evans was ostensibly the owner, and that his creditors would be induced to credit him on that account, and so would be defrauded. But the same objection lies in every case where one man has the actual possession, and another has the constructive possession, together with the legal right of property, in goods or chattels. It is evidence tending to prove that the transaction is fraudulent against creditors, but not conclusive, oi fraudulent *per se.*

Now we hold it to be clear, that the plaintiffs had a right to retain Evans's part of the bricks under this contract. It was expressly agreed by Evans that they should have such a right. Without such a right it is not to be supposed that the plaintiffs would have made the great advances which were necessary to enable Evans to make the bricks. Every brick as it was formed may well be considered as delivered to the plaintiffs in part execution of the contract. The whole were put into kilns and burnt in the plaintiff's yard; for as assignees of the lessees, they legally held the yard in their possession during the term. It was their land, *pro hac vice*, as much as it would have been if it had been held by them in fee simple. And there the property remained when the defendant attached it.

But it is contended, that if the plaintiffs had a right to retain, they have not in fact retained, but have parted with their right by permitting Evans to have the charge of the property.

The jury have found that the plaintiffs did retain the possession. But if upon the facts reported upon that point, the evidence is not sufficient to support it, the verdict must be set aside. We think that the evidence is sufficient, and that the plaintiffs have held the possession of the property which was pledged.

The substantial part of the evidence arises from the contract itself. Certainly nothing has been done in relation to the manufacturing of the bricks, which was not within the express provisions it contained. Evans " was to hire the men and board, and was to be allowed therefor ; he, to the best advantage, was to perform the manufacturing of the bricks ; and he was to give in his time and services in making the bricks." He must necessarily have the charge of the whole property in the yard, while he was in the process of making the bricks, and putting them into kilns and burning them, &c.

But it is contended that the plaintiffs have lost their pledge, by giving an authority to Evans to act as their special agent in the sale of parcels of the bricks at retail. Let us consider the terms of the authority ; and the legal operation of it upon the contract.

The first clause authorizes Evans to take the charge and

care of all the property and effects in and about the brick-yard, it having been assigned to the plaintiffs. Evans had by necessary implication the same authority under the contract, as before remarked. But by the terms of the contract, Hunting & Lawrence, and after their assignment, the plaintiffs, were to attend to " the selling of the bricks, purchasing wood," &c. And by the second clause in their written authority to Evans, *he* was empowered to sell the bricks at retail *until further orders* from the plaintiffs, for cash only, and whenever 100 dollars should be received, he was to deposit the same in the Branch bank to the plaintiffs' credit."

There is now no question before us, how he executed that agency ; whether he deposited the money when he had received to the amount of 100 dollars or not. If he abused the authority, and spent the money instead of placing it to the plaintiffs' account in the bank, the plaintiffs must unquestionably sustain the loss. But it is difficult to see how the plaintiffs can be otherwise affected by it.

It was a special limited authority, which bound the plaintiffs so far as it was executed, but which could not affect their right in and to the great bulk of the property, which remained untouched by the agent. A release of part of an undivided portion of things pawned or pledged, will operate only as an extinguishment *pro tanto*. Story on Bailm. *p.* 244, § 364. It is a question of intent. ibid. § 365.

Besides, by the express terms of the authority, this special agency was to continue only until *further orders ;* and the case finds that the plaintiffs were afterwards dissatisfied. They discharged Evans, and appointed Hunting to be their agent, before the attachment was made. So that from the time Evans was discharged, until the attachment, the plaintiffs had the actual possession, care and charge of the brick-yard, bricks and property, by themselves or their new agent, Hunting.

To say that this limited authority to sell bricks by retail, in small sums, on account of the plaintiffs, was a waiver of their possession of the residue that remained in the kilns in their yard, would be clearly against the intent and meaning of the parties, unreasonable, and unwarranted by the evidence.

But no possession, charge, care or authority, was ever given

to Evans in his character of *pledger* of the bricks. The general authority which he had under the contract, to take the charge of the yard while the process of manufacturing was going on, was an agency *quoad hoc* created by necessary implication. If it were not so, the agreement to retain was a *felo de se*. And the special authority given by the plaintiffs to Evans, was to clothe him with the character of agent to a limited extent only, and no remission to him, in his character of pledger, of the plaintiffs' right to retain the bricks according to the agreement. He was their special attorney, with a limited power. Com. Dig. *Attorney*, *C* 4. "Many persons have ability to act as an attorney for others ; as a monk, infant or alien, may make livery as an attorney," &c. A feme covert may make livery to her husband, or *vice versa*. So she may act for him in any department or business. *Emerson v. Blonden*, 1 Esp. Rep. 142. So her promise for her husband will take the case out of the statute of limitations, she being authorized to act in that behalf for him. Per *Buller* J. in *Palethor* v. *Furnish*, 2 Esp. Rep. 511, note. So a man may be an attorney to another though he has an interest ; as he in remainder shall be an attorney to give livery to the lessee for life.

And in these cases, the act done by the attorney is treated in the law just as if it had been done by the principal who gave the authority. Thus in *Moor* 11, *pl.* 41, "the lessor made a letter of attorney to his lessee for years, to make livery of the land which was under lease, to a stranger, who made it accordingly. It was nevertheless agreed, that the act and agreement of the lessee was no surrender of his term, for he did not make the livery in his own right, but as the servant or agent [minister] of the lessor, and by his authority. And when the lessor made the feoffment, he did not give any thing but what might rightfully pass, viz. his *reversion*. And the livery of the *lessee* gave nothing to the feoffee, but is only the mode of passing that which the *lessor* might lawfully pass. As if the tenant make a feoffment of his tenancy, and the lord as attorney make livery, it does not extinguish his seigniory, for he did nothing unless by the authority given." The reason is clear. The lessee was not acting in his character as lessee,

but as an agent and attorney of the lessor. It was legally the act of the lessor. Co. Lit. 112 *b*. Paley on Princip. and Agent, *pt.* 1, § 1, "In all cases where a man has power as owner, or in his own right, to do any thing, he may do it by another ; as to sell his lands, goods," &c.

And the principal shall not be prejudiced beyond the authority given, any more than the attorney shall be prejudiced by the execution of the authority or agency.

Suppose that A keeps a livery stable, and sells a horse or pledges a horse to B, and delivers the possession to B accordingly ; may not B keep the horse at the same stable afterwards, without losing his possession ? From and after the delivery, A acts in character of livery-stable-keeper merely, not in character of owner.

Suppose that A, having so pledged and given possession of the horse, should go and live with B as a coachman ; and B should send him with the horse to be shod on his account by the blacksmith ; could it be maintained that B had waived or lost the possession of his pledge ? Clearly not. The possession would continue to be kept by the servant, for the account of the master.

If the vender or the pledger should have the actual possession of the property after it were pledged or sold, it would be only *prim\^a facie*, but not conclusive evidence, of fraud. The matter might be explained and proved to be for the vendee or pledgee. It is a most familiar principle, that one man may have the actual possession or custody, while another has the legal title and the constructive possession. *Brooks* v. *Powers*, 15 Mass. R. 244 ; *Badlam* v. *Tucker*, 1 Pick. 389.

And the same principle is recognised in *Latimer* v. *Batson*, 4 Barn. & Cressw. 652. In this case one R purchased certain furniture belonging to the Duke of M, seized by the sheriff on an execution against the duke. R sold the same to the plaintiff, who put his servant into possession, but the duke was permitted to continue to use the goods after the sale, just as he had done before. But the true state of the transaction was generally well known. Another creditor, however, levied his execution on the same goods as belonging to the duke. *Abbott* C. J. said, "Possession is much to be re-

43 *

Macomber<br>v.<br>Parker.

garded, but that is with a view to ascertain the good or bad faith of the transaction." It was so left to the jury. He said, the judge would not have been justified in telling the jury, that the sale was void in consequence of the duke's having enjoyed the use of the goods by the sufferance of the purchasers.

The lien would be destroyed if the party gives up his right to the possession of the goods. Whether he did relinquish it or retain it, was submitted to the jury as a fact, and they have found that he retained it.

In the case at bar, we think it to be perfectly clear, that the plaintiffs had the right to retain in virtue of the original contract ; that they took the actual possession ; that the right to retain was never waived or given up ; that the limited agency exercised upon some of the goods for the benefit of the plaintiffs, did not affect the great part of them that were attached ; and that no right to those goods ever passed from the plaintiffs to the pledger as such, he having merely a limited agency or power only to act for the plaintiffs in this respect, and which was revoked before the attachment.

In our opinion, the evidence upon this point is clearly sufficient to support the verdict, and judgment must be rendered for the plaintiffs accordingly.